**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF OHIO**
**WESTERN DIVISION**

Kiwi Hospitality – Cincinnati Central, LLC,  )
d/b/a Quality Inn & Suites,  )
                                                      )
                  Plaintiff,  )    Case No.: 1:22-cv-00538
                                                        )
                  vs.  )    Judge Michael R. Barrett
                                                        )
Princeton Excess and Surplus Lines Ins.  )
Co.,  )
                  Defendant.  )

**OPINION & ORDER**

This matter is before the Court on Defendant's Motion (Doc. 30) for Summary Judgment. Plaintiff filed a memorandum in opposition (Doc. 37), to which Defendant replied (Doc. 38). The Court heard oral argument[1] at Defendant's request[2]. As discussed below, Defendant's Motion will be GRANTED.

I.     **BACKGROUND**

**The Parties**. Plaintiff Kiwi Hospitality – Cincinnati Central, LLC ("Kiwi"), doing business as a Quality Inn & Suites hotel, owns the property located at 800 W. 8th Street, Cincinnati, Ohio 45203. (Doc. 4, First Amended Complaint, ¶ 4). Defendant Princeton Excess and Surplus Lines Insurance Company ("PESLIC") issued a commercial property insurance policy (effective May 23, 2021—May 23, 2022) ("Policy") to Kiwi. (*Id.* ¶ 5). Kiwi (through ACORD) filed a "Property Loss Notice" on March 3, 2022. (Doc. 29-1). PESLIC denied coverage on June 13, 2022. (Doc. 29-2). This suit followed.

---

[1] (*See* 07/26/2024 Minute Entry (Motion Hearing by Teleconference)).

[2] (*See* Doc. 30 PAGEID 772; Doc. 38 PAGEID 1626).

**The Policy Terms.**  The pertinent terms (appearing in 16-pt. font) read as follows:

**CAUSES OF LOSS – SPECIAL FORM[3]**

**A. Covered Causes of Loss**

When Special is shown in the Declarations, <u>Covered Causes of Loss</u> means <u>direct physical loss</u> <u>unless</u> the loss is <u>excluded or limited</u> in this policy.

**B. Exclusions**

. . . .

**2.** <u>We will not pay for loss or damage caused by or resulting from</u> any of the following:

. . . .

**d.(1)** <u>Wear and tear</u>;

**(2)** Rust or other <u>corrosion</u>, <u>decay</u>, <u>deterioration</u>, hidden or latent defect or any quality in property that causes it to damage or destroy itself;[4]

. . . .

. . . .

**3.** <u>We will not pay for loss or damage caused by or resulting from</u> any of the following, **3.a.** through **3.c.**  But if an excluded cause of loss that is listed in **3.a.** through **3.c.** results in a Covered Cause of Loss, we will pay for the loss or damage caused

---

[3] (Doc. 3-1, Causes of Loss – Special Form (CP 10 30 10 12), PAGEID 220–25 (underline emphasis added)).

[4] Hereafter (and collectively), "Wear & Tear Exclusion"

by that Covered Cause of Loss.

. . . .

**c.** <u>Faulty</u>, <u>inadequate</u> or <u>defective</u>:

. . . .

(**2**) Design, specifications, <u>workmanship</u>, <u>repair</u>, <u>construction</u>, renovation, remodeling, grading, compaction;

(**3**) <u>Materials used in repair, construction,</u> renovation or remodeling; or

(**4**) <u>Maintenance</u>;

<u>of part or all of any property</u> on or off the described premises.[5]

. . . .

**C. Limitations**

The following limitations apply to all policy forms and endorsements, unless otherwise stated:

**1.** We will not pay for a loss of or damage to property, as described and limited in this section. In addition, <u>we will not pay for any loss that is a consequence of loss or damage</u> as described and limited in this section.

. . . .

**c.** <u>The interior of any building or structure</u>, or to personal property in the building or structure, <u>caused by or resulting from</u> rain,

---

[5] Hereafter (and collectively), "Maintenance Exclusion"

<u>snow</u>, sleet, <u>ice</u>, sand or dust, whether driven by wind or not, <u>unless</u>:

**(1)** The building or structure first sustains damage by a Covered Cause of Loss to its roof or walls through which the rain, snow, sleet, ice, sand or dust enters; or

**(2)** <u>The loss or damage is caused by or results from thawing of snow</u>, sleet or <u>ice</u> on the building or structure.[6]

. . . .

. . . .

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

**The Claim.**  Kiwi alleges that it suffered "significant roof damages" from a "snow and ice storm" during the Policy period, which it reported to PESLIC.  (Doc. 29-1, Property Loss Notice, PAGEID 471–73).  At issue specifically are the roofs over: the first-floor (north) meeting room ("First Floor Roof"); the eleventh-floor hotel rooms ("Eleventh Floor Roof"); and the twelfth-floor banquet hall ("Twelfth Floor Roof").[7]  PESLIC assigned a third party, Sedgwick, to investigate the claim.  (Doc. 4 ¶¶ 6, 7; Doc. 29-2).  Kiwi retained the services of Green Public Insurance Adjusting ("Green") to represent its interests. (*Id.* ¶ 8).

Green engaged Nick Allen, AO Engineers, to inspect the roofs and determine the cause of the damage.  Sedgwick, in turn, hired Leonard T. Rudick, P.E.

**Kiwi's Expert's Findings**.  Mr. Allen inspected the property on March 29, 2022;

---

[6] Hereafter, thawing exception to "Rain Limitation"

[7] Kiwi tendered a repair estimate (from James Elliott Roofing) in the sum of $2,145,461.00.  (*See* Doc. 4 ¶ 10).  Kiwi also tendered estimates (to address the consequent water intrusion damage) from Dry Effect, in the sum of $231,287.87, for "emergency" remedial measures and from ServiceMaster, in the sum of $73,273.22, for cleaning services.  (*Id.* ¶¶ 12, 13).

his written report issued on April 4. (*See* Doc. 29-6, AO Engineers Structural Assessment Report).[8] The Court's summary of (facts found within) that report follows.

The First Floor (North Meeting Room) Roof consists of an EPDM[9] synthetic rubber membrane. (*Id.* PAGEID 526). Certain areas had been recently repaired because of past leakage around the (cast iron) roof drains. (*Id.*). There were water stains and mild corrosion in the steel roof structure indicative of "past moisture infiltration". (*Id.* PAGEID 527). A "close[]" inspection of the EPDM membrane revealed several areas where the seams were inadequate and "appeared to allow for moisture to easily infiltrate[.]" (*Id.*). Also, there was "soiling and debris" at some of these "inadequate" seams "that would suggest collection of storm water in these regions." (*Id.*). Finally, the roofing membrane on the south end of the roof—the edge adjacent to the hotel—was improperly sealed to the structure. (*Id.*).

The Eleventh Floor Roof over the hotel rooms "consisted of what appeared to be a spray[-]on silicone roof coating over foam placed over the original roofing membrane." (*Id.*). There were "many obstructions and roof penetrations[,]" as well as "several" areas "in which soiling and debris were collecting in low spots[.]" (*Id.*). Upon "walking" the roof, Mr. Allen noted approximately an inch of water trapped between the "exposed" membrane and the original one. (*Id.*).

The Twelfth Floor Roof (above the Banquet Hall) consisted of "what appeared to

---

[8] Mr. Allen also issued a rebuttal report (Doc. 29-7) and was deposed (*see* Doc. 29-8) by counsel for PESLIC.

[9] EPDM is an acronym for "ethylene propylene diene terpolymer". ERA EPDM Roofing Ass'n, "What is EPDM?" available at https://epdmroofs.org/what-is-epdm/ (last visited 3/28/2025). As Mr. Rudick explained in his deposition, "EPDM is a modified rubber material. I can't remember the chemistry of it, but it's not an asphalt based product. It's I believe it's a plastic product[.]" (Rudick depo., Doc. 36 PAGEID 1497–98 (63:23–64:1)).

be a modified bitumen roof with a pea gravel ballasted topper." (*Id.*). "Many" of the roof seams "were not visible due to the existing ballast." (*Id.*). Mr. Allen "tried using a broom to move the ballast around" but the gravel "was 'glued' in place at the seams and could not be pushed away to closely observe the existing seams[.]" (*Id.*). A "few" locations, however, "appeared to be potential moisture infiltration culprits[.]" (*Id.*). Mr. Allen was unable to inspect the roof framing to identify any "potential moisture infiltration locations[]" because "the roof trusses [had been] sprayed with fire proofing[.]" (*Id.*).

Mr. Allen rendered these five conclusions:

- The winter storm that occurred during the evening of Thursday February 3rd into Friday was unique in the manner that the temperatures were relatively warm followed by a significant drop in temperature during heavy rain that eventually turned into freezing rain, sleet and snow.

- The days following the winter storm were above freezing during the afternoon and early evening, but below freezing at morning and night. These conditions likely resulted in ice dams on the roof which were also witnessed by Josh [in charge of maintenance at the property] following the storm. Ice dams can form due to poor insulation or heat given off from mechanical equipment. When the ice dam builds up, it can trap water to prevent the roof from properly draining as intended. Therefore, pooling of water may occur as a result.

- Based on my observations, it's my professional opinion that the water damages observed at the time of my assessment was **partly** attributed to ice dams as a result of the winter storm that occurred on February 3rd-4th. However, the (3) roof conditions were relatively poor. There were obvious indications of open seams in the EPDM roof, punctures and standing water on the sprayed roof, and open seams in the banquet room roof.

- All of which may have resulted in past, but minor moisture infiltration that wasn't noticed following a typical rain event. The extraordinary event (ice damming) described above likely intensified the magnitude of the existing roof imperfections and appeared to allow significant amount of leakage due to

<u>trapped storm water that normally would have drained away
under normal circumstances.</u>

- It should be noted that although visual observations were
limited, there were no obvious indications of structural
deficiencies in the roof framing observed at the time of my
assessment.

(*Id.* PAGEID 528 (all emphasis added)).

**PESLIC's Expert's Findings.**  Mr. Rudick likewise inspected the property; his
written report issued on April 8, 2022.  (Doc. 29-3).[10]  The Court's summary[11] of (facts
found within) that report follows.

From the vantage point inside the North Meeting Room, where water infiltration
had occurred, "the underside of the [First Floor] ribbed metal roof decking was heavily
pitted with both rust (iron oxide) and zinc oxide corrosion[.]"  (*Id.* PAGEID 480).  Once
outside, Mr. Rudick noted that the "EPDM appeared to be at least 20 years old, and
possibly older[.]"  (*Id.* PAGEID 481).  "The substrate for the EPDM was moderately soft
(as indicated by its feel underfoot and under thumb pressure), indicating that it has been
wet for a long period of time (typically much longer than the two months since the ice and
snow accumulation)."  (*Id.*).  He noted "a few areas where seams had failed."  (*Id.*).  He
also noted "a large area of water ponding along the east end of the roof and lesser areas
of ponding at other locations."  (*Id.*).  Mr. Rudick found "incidences of screw fastener
backouts, often caused by fastener corrosion[.]"  (*Id.*).  "The substrate for the 10 foot wide
strip patch along the south end of the roof was in even worse condition, with an extremely

---

[10] Mr. Rudick also issued a rebuttal report (Doc. 29-4) and was deposed (*see* Doc. 36) by counsel for
Kiwi.

[11] Mr. Rudick's observations are supported by reference to photographs, which the Court does not include
in its recitation.

soft substrate and screw fastener back-outs[.]" (*Id.*). Finally, the "tie-in between the strip patch and the original membrane had been heavily caulked and patched[.]" (*Id.*).

Like Mr. Allen, Mr. Rudick noted that the Eleventh Floor Roof was "covered with a spray polyurethane foam" membrane. (*Id.*). "The membrane showed widespread ponding, as evidence both by staining and by water accumulation" at the time of inspection. (*Id.*). He felt a "large" water blister, "several feet" in diameter, in an area "directly adjacent" to the roof access door. (*Id.*). Upon consulting a trade group publication, Mr. Rudick categorized this blister as a "Type D.---Intra-Substrate", described as occurring "between layers in the original roof system[,]" caused by "[p]oor adhesion between felts, between felts and insulation, or between insulation and deck." (*Id.* PAGEID 481–82).

Mr. Rudick described the Twelfth Floor Roof as a "gravel covered built up roof [BUR][12] with large areas of that roof subsequently removed and replaced with modified bitumen." (*Id.* PAGEID 482). "The original BUR membrane appeared to be very old, possibly 30 years or more." (*Id.* PAGEID 482–83). He noted: (1) "black spheres protruding from the BUR gravel cover, possibly beads of coal tar pitch, and indicative of the deterioration and advanced age of the BUR"; (2) "one area where the modified bitumen showed a pronounced linear depression"; (3) "makeshift" repairs to "HVAC

---

[12] "[A] built-up roofing system [i]s a roof where multiple layers of asphalt alternated with ply sheets (felts) are applied over the roof deck (vapor retarder) and, most often over insulation that is attached to the roof decking." Asphalt Roofing Manufacturers Ass'n, "BUR Multi-Ply Built-Up Roofing" available at https://www.asphaltroofing.org/bur-multi-ply-built-up-roofing/ (last visited 3/28/2025). As Mr. Rudick explained in his deposition, "You'd put organic felts down, layers of organic felts, and then you block those with heated asphalt material or coal tar, and then – and you'd layer it that way, organic felts, asphalt, organic felt, asphalt, as many layers as you want to get. . . . [The asphalt] would bind everything together. And the organic felt would give it structural strength." (Rudick depo., Doc. 36 PAGEID 1490 (56:7–17); *see also id.* PAGEID 58 (58:5–9) (The term BUR means "[b]uilt-up roof, and that is an umbrella description for either an asphalt or a coal tar pitch [roof]."))·

equipment curb flashings"; and (4) "some indication of seam failures at tie-ins between the modified bitumen and the BUR and areas where the seams had been caulked". (*Id.* PAGEID 483).

Mr. Rudick rendered these three conclusions "to a reasonable degree of engineering certainty"—

- The first and twelfth floor roofs were aged and deteriorated and had developed breaches (seam failures and possible tears, pinholes, etc.) and flashing failures due to the long term membrane deterioration.  The roof membranes were not damaged by any fortuitous cause, such as wind, hail, lightning, impact or weight of ice and snow.

- The eleventh floor roof sustained damage (a large water filled blister) due to either failures in elements of the substrate underlying the SPF membrane system, or a bond failure between the SPF membrane system and the underlying substrate.  The SPF membrane was not damaged by any fortuitous cause, such as wind, hail, lightning, impact or weight of ice and snow.

- The interior leakage that occurred through the first and twelfth floor roofs was caused by hydrostatic head (pressure) on the water from ice and snow that was trapped at the interface of the ice and snow accumulation and the roof membrane (due to frozen or blocked interior drains), with that water then infiltrating through pre-existing holes and seam failures.

  The hydrostatic pressure drove the melt water through pre-existing breaches in the membrane resulting in greater interior water infiltration than would have occurred during normal rainfalls.

(Doc. 29-3 PAGEID 485 (underline emphasis added)).

**PESLIC Denies Coverage.**  Sedgwick (on behalf of PESLIC) denied coverage in a letter dated June 13, 2022.  (Doc. 29-2).  Relevant excerpts include:

. . . .

. . . Field adjuster, Michael Douglas, was assigned and inspected the

damage on 03/20/2022, along with Leonard Rudick, P.E. They inspected the three roofs on this building that you claim were damaged by the weight of snow and ice. The engineer found that the first and twelfth floor roofs were aged and deteriorated and had developed breaches in the form of seam failures, likely tears and pinholes, etc. He also noted flashing failures due to long-term membrane deterioration. The engineer did not find any roof membrane damage from the weight of ice and snow.

The engineer additionally notes that the eleventh floor roof sustained damage described as a large water filled blister that he notes would have resulted from failures in elements of the substrate underlying the SPF membrane system, or a failure of the bond between the SPF membrane system and the underlying substrate, but not from a build-up of snow and ice. Finally, the engineer reviewed the interior water damage that occurred through the first and twelfth floor roofs, which he notes was likely water from the snow and ice build-up that [    ] infiltrated through the pre-existing roof holes and failures in the roof seams.

. . . .

You are seeking coverage for damage that is the result of [ ] water migrating through existing holes and damage due to wear and tear on your roofs that caused water damage to the building interior. However, for coverage to apply there must be direct physical loss to Covered Property at the premises described in the Declarations caused by or resulting from a covered Cause of Loss. A build up of snow and ice that results in water intrusion through existing holes and damage[ ] in an aged roof is not a covered cause of loss. The Princeton Excess and Surplus Lines Insurance Company **must** hereby **deny coverage for the wear and tear to your roofs**, **and the resulting interior water damage**.

(Doc. 29-2 PAGEID 474–75, 477 (all emphasis added)). In its papers, Kiwi summarizes this "Denial Letter" as being based "exclusively on the Wear [&] Tear and Maintenance Exclusions" in the Policy. (*See* Doc. 37 PAGEID 1618).

**This lawsuit**. Kiwi filed suit against PESLIC in the Court of Common Pleas for Hamilton County, Ohio on August 11, 2022. (*See* Doc. 3). The case was timely removed here (based on diversity jurisdiction) on September 19, 2022. (*See* Doc. 1 ¶ 8). Kiwi's

First Amended Complaint alleges not only breach of contract (Count One), but also bad faith (Counts Two, Three, and Four). The parties agreed to initially conduct discovery— and file dispositive motions—as to the issue of coverage only (Count One). (*See* 12/04/23 Minute Entry; *see also* Doc. 13, Joint Discovery Plan, PAGEID 420 (¶ C), 424 (¶ H)).[13]

PESLIC timely filed a motion for summary judgment. (Doc. 30). It argues that there is no coverage under the Policy for damage: (1) to the three roofs; or (2) from the consequent water intrusion (into the North Meeting Room and the Banquet Hall initially, and later (eleventh floor) guest rooms). Kiwi argues that a factual dispute exists as to the application of the Policy exclusions upon which PESLIC relies.

## II. LAW & ANALYSIS

**Summary Judgment Standard.** Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A dispute is "genuine" when "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A fact is "material" only if its resolution affects the outcome of the suit. *Id.* On summary judgment, a court must view the evidence and draw all reasonable inferences in favor of the nonmoving party. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). The moving party has the burden of showing an absence of evidence to support the non-moving party's case. *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986). Once the moving party has met its burden of production, the non-moving party cannot rest on its pleadings but,

---

[13] The calendar was stayed as to the amount of business loss Kiwi claims to have suffered. (*See* 12/04/2023 Minute Entry).

instead, must present significant probative evidence in support of its complaint to defeat the motion for summary judgment. *Anderson*, 477 U.S. at 248–49. That is to say, the non-moving party "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita*, 475 U.S. at 586; *Amini v. Oberlin Coll.*, 440 F.3d 350, 357 (6th Cir. 2006).[14]

**Ohio Law Applies**. As mentioned, this case was removed to the Southern District of Ohio based on diversity jurisdiction. (Doc. 1 ¶ 8). Thus, '[w]hether summary judgment [i]s appropriate here turns on the application of Ohio contract law." *Wells Fargo Bank, N.A. v. Allstate Ins. Co.*, 784 F. App'x 401, 403 (6th Cir. 2019) (citing *Affiliated FM Ins. Co. v. Owens-Corning Fiberglas Corp.*, 16 F.3d 684, 686 (6th Cir. 1994) (applying state substantive law on exercise of diversity jurisdiction)).

**James Elliott Affidavit**. Kiwi attaches (to its memorandum in opposition) an affidavit from its roofer, James Elliott, who offers his opinion that "the roofs at the Hotel suffered damage **as a result of ice buildup caused by the storm**." (Doc. 37-1 ¶ 6 (bold emphasis added)). Mr. Elliott was not disclosed by Kiwi as an expert on causation, however, as required under Fed. R. Civ. P. 26(a)(2). (*See* Doc. 17 ¶ 1)). Instead, he was identified as one of two experts on the cost to *repair* the damage Kiwi's property sustained in the wake of the storm. (*Id.* ¶ 1). Because PESLIC had no opportunity to depose Mr. Elliott, "the reliability of his testimony, as well as his qualifications to offer such testimony, have never been examined." (Doc. 38 PAGEID 1635). Accordingly, PESLIC asks the Court to disregard his testimony. (*Id.*).

---

[14] To this end, "[t]he court need consider only the cited materials, but it may consider other materials in the record." Fed. R. Civ. P. 56(c)(3).

During oral argument, the Court indicated it would not consider the Elliott affidavit in deciding whether to grant summary judgment in favor of PESLIC. Here's why. Fed. R. Civ. P. 26(a)(2)(A) provides that "a party must disclose to the other parties the identity of any witness it may use at trial to present evidence under Federal Rule of Evidence 702, 703, or 705." Moreover, "[a] party must make these disclosures at the times and in the sequence that the court orders." Fed. R. Civ. P. 26(a)(2)(D). The docket indicates that Kiwi's expert disclosure date was extended (from June 15, 2023) to July 21, 2023. (*Cf.* Doc. 14 ¶ 4 *with* Doc. 16). As discussed, Mr. Elliott was not designated at that time as an expert witness on the issue of causation. The sanction is clear. "If a party fails to provide information or identify a witness as required by Rule 26(a) [    ], **the party is not allowed to use that** information or **witness to supply evidence on a motion**[ ], unless the failure *was **substantially justified or is harmless***." Fed. R. Civ. P. 37(c)(1) (all emphasis added). Kiwi doesn't argue either circumstance. And Rule 37(c)(1) requires "absolute compliance" with Rule 26(a). *Fed. Ins. Co. v. Benchmark Bank*, No. 2:17-cv-135, 2020 WL 635654, at *7 (S.D. Ohio Feb. 11, 2020) (Morrison, J.) (citing *Roberts ex rel. Johnson v. Galen of Virginia, Inc.*, 325 F.3d 776, 782 (6th Cir. 2003)).[15] Thus, Mr. Elliott may not testify as an expert on causation and the Court will not consider his affidavit in determining whether there is a genuine issue of material fact precluding summary judgment. *See Abundant Faith Cathedral v. State Auto Prop. & Cas. Ins. Co.*, 643 F.Supp.3d 758, 763–64 (E.D. Mich. 2022); *ABMK Prop. 6332, LLC v. Cen. Mut. Ins. Co.*, No. 21-11488, 2024 WL 4340700, at *13 (E.D. Mich. Sept. 27, 2024), *appeal dismissed*,

---

[15] Worth noting as well, Mr. Elliott's opinion is altogether conclusory, which is at odds with the requirements set forth in Fed. R. Evid. 702.
.

No. 24-1946 (6th Cir. Jan. 23, 2025).

**All-Risk Policy.**  Kiwi overly emphasizes that the Policy PESLIC issued contains an "all-risk" coverage grant.  (Doc. 37 PAGEID 1611, 1612, 1620–21).[16]  "'An "all-risk" policy creates coverage of a type not ordinarily present under other types of insurance, and recovery is allowed for fortuitous losses unless the loss is excluded by a specific policy provision.'"  *O.L. Matthews, M.D., F.C. v. Harleysville Ins. Co.*, 826 F. App'x 508, 512 (6th Cir. 2020) (quoting 10A Steven Plitt et al., *Couch on Insurance* §148:50 (3d ed. 2019)) (construing Michigan law).  "But an 'all-risk' policy does not cover every risk; a court must carefully examine the policy's exclusions and limitations to determine whether a particular loss is covered."  *Id.*[17]

Like the claim in *Matthews,* this case turns on whether at least one of the Policy's exclusions applies to bar coverage for the water damage to the three roofs (and, derivatively, the interior).  *Id.*  Kiwi points out that the Sixth Circuit construed Michigan law in *Matthews*.  True, but Ohio law defines an all-risk policy in the same way, to wit: a policy

---

[16] Kiwi cites to the following "penultimate" form:

**BUILDING AND PERSONAL PROPERTY COVERAGE FORM**

. . . .

**A.  Coverage**

> We will pay for <u>direct physical loss of or damage to</u> Covered Property at the premises described in the Declarations caused by or resulting from any <u>Covered Cause of Loss</u>.

. . . .

(*See* Doc. 37 PAGEID 1611 (quoting Doc. 3-1, Building and Personal Property Coverage Form (CP 00 10 10 12), PAGEID 232)) (underline emphasis added).

[17] For this reason, at least one circuit court has observed that the term "all-risk" is a "misnomer."  *Aetna Cas. & Sur. Co. v. Yates*, 344 F.2d 939, 940 (5th Cir. 1965) (cited in *Univ. of Cincinnati v. Arkwright Mut. Ins. Co.*, 51 F.3d 1277, 1280 (6th Cir. 1995)).

that "pays for all physical loss to real property **unless such loss is specifically excluded**." *Simon v. Encompass Ins. Co.*, No. 86143, 2002 WL 2811890, at ¶ 18 (Ohio App. 8th Dist. Oct. 27, 2005) (bold emphasis added). This is in contrast to "named-perils" insurance, which covers *only the events specifically noted* in the policy. *See Wells Fargo Bank, N.A. v. Allstate Ins. Co.*, 290 F.Supp.3d 715, 721 & n.4 (N.D. Ohio 2017). A policy can have both "all-risk" (also called "all-perils") and "named-perils" provisions. *Id.* at 722.

**Doctrine of Fortuity.** In support of summary judgment, PESLIC argues first that Kiwi's claimed damages lack the "critical" element of fortuity. (Doc. 30 PAGEID 781–83; Doc. 38 PAGEID 1632–35). Kiwi responds that PESLIC did not raise this issue when it denied coverage. (Doc. 37 PAGEID 1612, 1620). Moreover, Kiwi believes that an "all-risk" coverage grant inherently trumps any fortuity requirement.

PESLIC's "fortuity" argument—as it relates to the circumstances of this case—is a red-herring.

PESLIC relies on the Report & Recommendation adopted in *Univ. of Cincinnati v. Arkwright Mut. Ins. Co.*, No. C-1-91-714, 1993 WL 512614 (S.D. Ohio Aug. 17, 1993). There, the insurer denied coverage for property damage to a college dormitory that occurred when asbestos was removed from the building prior to its demolition (as required by both federal and state regulatory laws). The Magistrate Judge recommended that summary judgment be entered in favor of the insurer and against the insured:

> . . . The fortuity doctrine applies in Ohio. [(citation omitted)]
>
> . . . [T]he applicability of the fortuity doctrine to this case is not a complex matter to resolve. To put it simply, UC's removal of the asbestos from (and the resulting property damage to) Sander Hall was not even remotely fortuitous. As explained above, UC voluntarily elected to demolish Sander Hall. UC then knew that, as a pre-condition to demolition, it was required by law to remove the

asbestos from the building.  UC also **knew**, prior to commencement of asbestos removal, **or** then **reasonably should have known**, **that** during removal, **property damage** to Sander Hall **would undoubtedly occur** on account of (1) the very nature of the asbestos removal process, and (2) the significant amount of asbestos needed to be removed from each of Sander Hall's 27 floors.  There was thus no element of chance, nor anything sudden or unexpected, about the property damage caused to Sander Hall as a result of UC's decision to proceed with asbestos removal.  Accordingly, Arkwright was correct in denying coverage to UC under the parties' all-risk insurance policies because the subject property damage was not caused fortuitously.

*Id.* at *2–3 (all emphasis added).  PESLIC likens this circumstance to Kiwi's purported deliberate decision to not replace or maintain the three roofs in question.  (Doc. 30 PAGEID 782 ("Here as well, there is no element of fortuity, i.e., chance, or something beyond Kiwi's control, that resulted in all of its claimed damages, as rainwater and melting snow will necessarily and **inevitably** intrude into the premises, **when enough precipitation falls**, where a roof contains openings due to wear and tear through which the water can enter; **it is hardly unexpected or unforeseeable**.  Indeed, it is the precise opposite; **it is a certainly as opposed to a risk**.  Hence, the damage is not fortuitous, and as such it is uninsurable.")) (all emphasis added).  This comparison, however, is altogether inapposite.  The university took deliberate action that it *knew* would result in damage.  Kiwi, instead, took *no* action and (presumably) hoped for the best.

In affirming summary judgment in the insurer's favor, the Sixth Circuit observed that UC's losses "were neither unanticipated nor unintended.  The decision to demolish Sander Hall and the consequent decision to remove the [asbestos] from the building before the demolition were solely in the discretion of plaintiff's board of trustees.  It can hardly be argued that the damage to the building brought on by the asbestos removal process was **a matter of chance** when plaintiff exercised total control over whether and

when such damage would occur and possessed discretion to execute its own loss." *Univ. of Cincinnati v. Arkwright Mut. Ins. Co.*, 51 F.3d 1277, 1282 (6th Cir. 1995) (citation omitted) (all emphasis added).[18]  But a winter storm *is* a matter of chance, and PESLIC cannot seriously argue that Kiwi had control of the weather on February 3, 2022.

PESLIC's second argument in support of summary judgment, however, discussed next, *is* persuasive.

**Policy Exclusions.**  PESLIC is entitled to summary judgment on the issue of coverage, because the cause of the property loss suffered by Kiwi—roof damage and consequent water intrusion—is excluded under the Policy.

"When an insurer denies liability coverage based on a policy exclusion, the insurer bears the burden of demonstrating its applicability." *HoneyBaked Foods, Inc. v. Affiliated FM Ins. Co.*, 757 F.Supp.2d 738, 744 (N.D. Ohio 2010) (citing *Continental Ins. Co. v. Louis Marx & Co., Inc.*, 64 Ohio St.2d 399, 401–02, 415 N.E.2d 315, 317 (1980)).[19]  *See Alexander v. State Farm Fire & Cas. Co.*, No. 23-3364, 2023 WL 11198603, at *1 (6th Cir. Dec. 26, 2023) ("Under Ohio law, '[t]he insurer bears the burden of proving the applicability of an exclusion in its policy.'") (quoting *Retail Ventures, Inc. v. Nat'l Union Fire Ins. Co.*, 691 F.3d 821, 832 (6th Cir. 2012) (citing *Continental Ins. v. Louis Marx*)). PESLIC handily meets this burden, relying on the observations and opinions of its insured's expert, as well as its own.

---

[18] "Were we to ignore plaintiff's control over its loss in deciding the fortuitousness of plaintiff's claim, we would convert plaintiff's all-risk insurance policy into a cash fund for plaintiff's business plans.  Plaintiff essentially invites this court to find that its intentional destruction of property is covered under its insurance policy.  We decline this invitation[.]"  *Id.*

[19] "'In order to defeat coverage, the insurer must establish not merely that the policy is **capable** of the construction it favors, **but** rather that such an interpretation is **the only one that can fairly be placed** on the language in question.'"  *HoneyBaked Foods,* (quoting *Andersen v Highland House Co.*, 93 Ohio St.3d 547, 549, 757 N.E.2d 329, 332 (2001) (citation omitted)) (bold emphasis added).

The Policy plainly states that PESLIC will not pay for loss or damage caused by or resulting from "wear and tear" or a lack of maintenance.  As previously noted, each expert indexed multiple examples of both.  So much so that Kiwi's expert, Nick Allen, qualified his opinion that "the water damages [he] observed" were attributable to the "ice dams" that formed on the roofs in the aftermath of the winter storm.  (*See* Doc. 29-6 PAGEID 528).  They were only "partly" attributable to the ice dams, because:

> [T]he (3) roof conditions were <u>relatively poor</u>.  There were <u>obvious indications of open seams</u> in the EPDM [First Floor] roof, <u>punctures and standing water</u> on the sprayed [Eleventh Floor] roof, and <u>open seams</u> in the banquet room [Twelfth Floor] roof.[20]
>
> <u>All of which may have resulted in the past</u>, but minor moisture infiltration that wasn't noticed following a typical rain event.  The extraordinary event (<u>ice damming</u>) described above <u>likely intensified the magnitude of the existing roof imperfections and appeared to allow significant amount of leakage due to trapped storm water</u> that normally would have drained away under normal circumstances.

(*Id.* (underline emphasis added)).  Said another way, all three roofs were in disrepair *prior to* the February 3rd weather event.  And the consequent water intrusion damages resulted from *existing* roof "imperfections" made worse by ice dams.

Mr. Allen was asked to elaborate as to his conclusions about each roof (on cross-examination) during his deposition:

> Q. Mr. Allen, in all our discussion of conditions which you viewed to be <u>defects</u> of the roof, this **[F]irst [F]loor [R]oof**, that we discussed today, did I understand you correctly to testify that <u>each and every one of them</u>, in your opinion, probably <u>preceded in existence the</u> February 3rd, 2022 <u>storm event</u>?
>
> A. Probably, <u>yes</u>.
> . . . .
>
> Q. Did I understand your testimony correctly so far this morning that

---

[20] Mr. Allen later testified that "open or loose seams" are "failures" in the roof membranes.  (Doc. 29-8 PAGEID 604 (59:9–16)).

with respect to <u>each and every defective condition</u> that you've pointed out in your report and testified about for that [First Floor Roof], that <u>not a single one of them resulted from, or was caused by the</u> February 3rd, 2022 <u>storm event</u>?

A. <u>Correct</u>.

(Doc. 29-8 PAGEID 618 (73:1–7, 13–19)) (all emphasis added).

Q. Based upon your investigation from being there, what did you learn about what kind of roof [the **Eleventh Floor Roo**f] was?

A. So I believe you could actually see the foam through some of the existing penetrations, which I think is why I also said it was over a foam, with foam placed over the original.

Q. All right.  So the top layer is a spray on silicone roof coating, correct?

A. Yes.

Q. And, then, under that coating, that layer is foam, is that correct?

A. Based off my observations at the penetrations.

Q. Okay, so <u>there were penetrations in the top layer</u>?

A. <u>Yes</u>.

Q. And you were able to see down through those penetrations, the next layer?

A. In some of the penetrations, yes.
. . . .

Q. Did you form an opinion as to whether <u>those penetrations</u> had preceded the February 3rd, 2022 <u>storm event</u>?

A. Most of them, I would say likely, <u>yes</u>.

Q. Were there any that you thought post dated the February 3rd, 2022 storm event?

A. I wouldn't be able to say confidently.

Q. Why did you think most of them, if not all of them, preceded the

February 3rd, 2022 storm event?

A. Just based off of the discoloration, like the exposed fo[a]m or like in the – standing at the openings.

Q. All right.  So, based upon evidence of weathering and exposure to the elements?

A. Right.
. . . .

Q. Were there any, with respect to any of these punctures, would you describe these punctures as openings?

A. Well, they were punctures that allowed moisture to get through, they were a break in the rubber coating.

Q. Did you have an understanding of how they came to be there?

A. I can only speculate.

Q. Would your speculation be based upon your experience with roofs, or would it be a guess?

A. It would be based off of my experience.

Q. Based upon your experience, what did you think the cause of the punctures were?

A. Likely just impact damages.

Q. Impact from people walking on top, or ….

A. It did not appear to be from foot traffic.  It appeared to be miscellaneous materials that could have been dropped or fallen off adjacent roofs, I'm not sure.
. . . .

Q. Were there any defective conditions that you observed with respect to th[e **Eleventh Floor Roof**]?

A. Yes.

Q. What were they?

A. The punctures, and then water trapped between presumably the

original roof layer or the preceding roof layer and the applied layer on top.

Q. Were there any other defective conditions that you observed during your March 29th inspection?

A. In the roof itself, I don't recall beyond the, you know, blizzard of trapped water and then the observed obstructions – or I'm sorry, the observed penetrations.

Q. Okay.  Did you have an understanding of how the water came to be present between the original roof and the layers on top of it?

A. I would presume through existing penetrations – or I'm sorry, existing punctures.

Q. Have you, we've gone over – have we gone over all the defective conditions that you observed with respect to the [**Eleventh Floor Roof**]?

A. Regarding the roof materials and the – I believe so.
. . . .

Q. [W]ith respect to the condition, the defective conditions that you observed on the [**Eleventh Floor Roof**], you haven't identified any, in your report or testimony today, that you did not believe preceded the February 3rd, 2022 storm event, correct?

A. Not that I recall, beyond what we just talked about.

(*Id.* PAGEID 620–21 (75:24–76:15), 621–22 (76:24–77:12), (78:7–25), (80:24–81:20)

(82:14–19)) (all emphasis added).

Q. What kind of roof was [the **Twelfth Floor Roof**]?

A. It's a sort of modified bitumen roof that there's like a pea gravel on top where it goes over the seams.

Q. Okay.  And you indicate in your report that there were a few locations that appeared to be potential moisture infiltration culprits, correct?

A. Right.

Q. And what kind of moisture infiltration culprits, or what does that

mean?

A. Just failed – failed seams.

Q. All right.  And, then, were there any other possible sources of moisture infiltration that you observed with respect to t[he **Twelfth Floor Roof**]?

A. Not that I recall.

Q. So, to the best of your understanding, based upon your investigation, you concluded that the <u>potential sources for moisture infiltration were open seams</u>, correct?

A. Yes.

Q. And did you – was it your opinion that <u>these open seams preceded February 3rd, 2022</u>?

A. Likely, <u>yes</u>.

Q. Did you arrive at the opinion that any of the open seams did not exist prior to February 3rd, 2022?

A. <u>They likely existed prior to February</u>.

(*Id.* PAGEID 628–29 (83:7–84:6)) (all emphasis added).

Overall, Mr. Allen confirmed that the storm did not change "the existing roof imperfections."  (*Id.* PAGEID 631 (86:22–25)).  But because of the "nature" of the storm, "more water passed through those pre-existing openings[.]"  (*Id.* PAGEID 630 (85:9–15); *see id.* PAGEID 632 (87:1–5)).  The term "hydrostatic pressure" does not appear in Mr. Allen's initial report; it is, however, included in his rebuttal report:

> I tend to agree with Leonard[ Rudick]'s assessment regarding the added hydrostatic head pressure as a result of ice/snow accumulation onto melt water that was trapped between the roof membrane and the ice.  I also agree that it was likely that the existing roof drains were frozen and/or were blocked due to ice surrounding the drains.
> . . . .

> It is important to note that <u>Mr. Rudick and I agree</u> that <u>the significant storm water infiltration that occurred was a result of the trapped snow/ice melt and amplified by the hydrostatic pressures applied by the upper layer of snow/ice</u>.  Ultimately, these events occurred as a result of the extraordinary ice storm.  Had the ice storm not occurred, and had the snow/ice melt not been trapped due to ice damming, it's likely in my professional opinion that the existing water damages would not exist assuming normal rainfall occurrences.

(Doc. 29-7 PAGEID 544) (underline emphasis added).  Mr. Allen later explained the intercourse between ice damming and hydrostatic pressure: "[W]e got heavy rain, followed by a significant temperature swing where everything kind of froze over, which essentially trapped water and the ice formed on top and created hydrostatic pressures." (Doc. 29-8 PAGEID 132–33 (677:23–678:1)).  He allowed for the fact that "[t]he presence of ponding water [similarly] applies a hydrostatic pressure."  (*Id*. PAGEID 691 (146:15–20)).  Hydrostatic pressure is a measure of "fluid" pressure, which includes but is not restricted to ice.  (*Id.* PAGEID 690–92 (145:13–147:17) ("The presence of water itself will provide hydrostatic pressures, yes.")).  Mr. Allen conceded that he "did not quantify the amount of hydrostatic pressure" (if any) attributable to ice on any of the three roofs. (*Id.* PAGEID 695 (150:2–15)).

Leonard Rudick, PESLIC's expert, authored a more analytical report.  That aside, he, too, concluded that all three roofs were compromised well before the winter storm.  Under either the "Wear & Tear Exclusion" or the "Maintenance Exclusion," or both, PESLIC was not obligated under the Policy to pay to repair or replace them.

What's more, Mr. Rudick and Mr. Allen principally agreed that the compromised roofs were the source of the water intrusion.  (*See, e.g.*, Rudick depo., Doc. 36 PAGEID 1533 (99:4–19)).  These same exclusions, then, excuse PESLIC from paying to remediate the interior damage.

23

Mr. Rudick initially rendered three conclusions, expanding to nine on rebuttal. When deposed, he clarified, "The cause of interior water damage that occurred on 2/4/2022 was age-related deterioration and the lack of proper maintenance *but also improper repairs and inadequate drainage* to the [roofs above the] first, eleventh, and twelfth floors." (*Id.* PAGEID 1547–48 (113:20–114:3)).  In addition, "The interior leakage that occurred through the first and twelfth floor roofs and the eleventh floor corridor and room 1105 was *exacerbated* [not caused] by hydrostatic head pressure." (*Id.* PAGEID 1548 (114:11–15)).[21] That pressure came from the ice and snow accumulation, or "surcharge", referred to here by both experts as "ice damming."  (*Id.* PAGEID 1476–78 (42:12–44:1)).

Kiwi argues, "even if the Court were to accept the fact that defects or maintenance issues exist with respect to the roofs of the Hotel, the Ice Storm played a significant factor in damage to the Hotel which has given rise to the Claim." (Doc. 37 PAGIE 1618).  Hence, the Court should "refuse" summary judgment, "since the Ice Storm is identifiable as the type of risk one would expect to be covered by the Policy." (*Id.* PAGEID 1619).  What an insured "expects" from its policy is neither here nor there.  What matters is the policy language.  And this Policy undeniably excludes "loss or damage caused by or resulting from" both "wear and tear" and "faulty, inadequate or defective maintenance."

A final word concerning the *in*applicability of the thawing exception to the Rain

---

[21] (*See* Doc. 36 PAGEID 1532–33 (98:10–99:3) ("A. No, I'm not saying that a normal rainfall would not cause infiltration. I'm simply saying it would cause less infiltration, . . . but we always would have infiltration as a result of rainfall when we have an open seam. **The reason being is that an open seam provides a capillary action or suction pressure mechanism to draw the water in through that seam.**  So it's not just a passive, it's not just a passive action of the water being there and passing through.  It's actually sucked into the seam by the – it's a surface tension differential between the water and the material and it's called suction pressure or capillary action.  So you always would have water infiltration during rain.  Q. Okay.  But it's more pronounced during instances of snow and ice is what you're saying?  A. That's correct.")) (bold emphasis added).

Limitation.  Both experts were clear that the water that leaked inside was already-melt water sandwiched between the compromised roof membranes and the ice dams.  None of the water intrusion damages have been ascribed to the ice dams thawing.  Accordingly, this Policy language is not relevant to the coverage question at hand.

### III.    CONCLUSION

The Court has looked for a question of material fact in the record evidence and has found none.  Thus, consistent with the foregoing, Defendant's Motion (Doc. 30) for Summary Judgment—as to Count One of the First Amended Complaint—is hereby **GRANTED**.  The Court finds as a matter of law that PESLIC has no duty to indemnify Kiwi Hospitality – Cincinnati Central, LLC for: (1) the damaged condition of three specific roofs at its premises; or (2) the water intrusion damages resulting from those conditions (all of which Kiwi attributes to the weather events of February 3, 2022).  PESLIC, therefore, has not breached its contract with its insured, Kiwi, on the issue of coverage.

**IT IS SO ORDERED.**

*/s/ Michael R. Barrett*
JUDGE MICHAEL R. BARRETT